

# SUPREME COURT OF GEORGIA

Atlanta    July 14, 2016

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

It appearing that the attached opinion decides a second-term appeal, which must be concluded by the end of the April Term, it is ordered that a motion for reconsideration, if any, must be **received in the Supreme Court E-Filing/Docket (SCED) System** by 4:30 p.m. on Thursday, July 21, 2016.

SUPREME COURT OF THE STATE OF GEORGIA
Clerk's Office, Atlanta

I hereby certify that the above is a true extract from the minutes of the Supreme Court of Georgia
Witness my signature and the seal of said court hereto affixed the day and year last above written.

, Chief Deputy Clerk

In the Supreme Court of Georgia

Decided:  July 14, 2016

S15G1303. PATTERSON v. THE STATE.

HINES, Presiding Justice.

This Court granted certiorari to the Court of Appeals in *Patterson v. State*, 332 Ga. App. 221 (770 SE2d 62) (2015), posing two questions: first, whether that Court erred in concluding that the crime of simple assault as set forth in OCGA § 16-5-20 (a) (2), does not require that the defendant have the specific intent to cause the alleged victim of the assault to suffer injury or the apprehension of injury, and second, if the Court of Appeals did so err, whether it further erred in concluding that the trial court properly refused to instruct the jury on the crimes of reckless conduct and reckless driving as lesser included offenses of aggravated assault.   For the reasons that follow, we affirm the judgment of the Court of Appeals.

Ricky Patterson lived in a mobile home with his girlfriend, Wanda Bartley.  While her adult son, Nathaniel Silvers, was present, Patterson and

Bartley argued, and Bartley and Silvers urged Patterson to leave the home. When Patterson, Bartley, and Silvers were outside the home, Patterson went to his vehicle, put it into gear, revved the engine, and rapidly drove directly toward the end of the home, near Silvers, who became pinned against the side of the home by the vehicle; Silvers suffered internal injuries. Further facts can be found in the opinion of the Court of Appeals. *Patterson*, supra.

The issues before this Court on certiorari involve Patterson's conviction on Count 4 of the indictment, in which he was charged with "aggravated assault with an object," as that crime is set forth in present OCGA § 16–5–21 (b) (2).[1] The indictment specifically alleged that Patterson

> did commit an act which placed another person, to wit: Nathaniel Lane Silvers, in reasonable apprehension of immediately receiving a violent injury, said assault having been committed with an object

---

[1] At the time of Patterson's indictment in February 2012, what is now OCGA § 16–5–21 (b) was codified as OCGA § 16–5–21 (a). The pertinent provision reads:

A person commits the offense of aggravated assault when he or she assaults:

> (1) With intent to murder, to rape, or to rob;
> (2) With a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury;
> . . . .

See Ga. L. 2014, p. 441.

which when used offensively against a person, is likely to and actually does result in serious bodily injury, by driving a motor vehicle in the direction of Nathaniel Silvers, striking Mr. Silvers with said vehicle, and pinning him up against a mobile home with said vehicle.

As this Court has noted,

> Aggravated assault has two elements: (1) commission of a simple assault as defined by OCGA § 16-5-20 [a][2]; and (2) the presence of one of three statutory aggravators. See OCGA § 16-5-21[(b)]. The statutory aggravators are: (1) intent to rape, rob, or murder; (2) use of a deadly weapon or an offensive weapon likely to or actually resulting in serious bodily injury;[3] and (3) shooting towards people from a vehicle without justification. See OCGA § 16-5-21[(b)](1)-(3).

*Guyse v. State*, 286 Ga. 574, 576 (2) (690 SE2d 406) (2010). See also *Brinson v. State*, 272 Ga. 345, 347 (1) (529 SE2d 129) (2000) ( "[C]entral to the offense of aggravated assault is that an assault as defined in OCGA § 16–5–20 be committed on the victim.") As such, Count 4 of the indictment charged

---

[2] OCGA § 16-5-20 (a) reads:

A person commits the offense of simple assault when he or she either:

(1) Attempts to commit a violent injury to the person of another; or
(2) Commits an act which places another in reasonable apprehension of immediately receiving a violent injury.

[3] It is uncontroverted that a motor vehicle may be used offensively against a person within the meaning of present OCGA § 16–5–21 (b). *Guyse v. State*, 286 Ga. 574, 576 (2) (690 SE2d 406) (2010); *Turner v. State*, 281 Ga. 487, 489 (1) (b) (640 SE2d 25) (2007).

Patterson with a simple assault under OCGA § 16-5-20 (a) (2), that was aggravated by the use of an object – Patterson's vehicle – that when used offensively against Silvers, was likely to, and actually did, result in serious bodily injury.

Patterson contends that as to Count 4, he was entitled to jury instructions on the lesser included crimes of reckless conduct, as set forth in OCGA § 16–5–60 (b),[4] and reckless driving, as set forth in OCGA § 40–6–390 (a).[5] The Court of Appeals correctly recognized that, as to both requests, a crucial issue is the culpable mental state required for the crime charged and the claimed lesser included offenses. See OCGA § 16-1-6.[6] See also *Edwards v. State*, 264 Ga.

---

[4] OCGA § 16–5–60 (b) reads:

A person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor.

[5] OCGA § 40–6–390 (a) reads:

Any person who drives any vehicle in reckless disregard for the safety of persons or property commits the offense of reckless driving.

[6] OCGA § 16-1-6 reads:

An accused may be convicted of a crime included in a crime charged in the indictment or accusation. A crime is so included when:

131, 132-133 (442 SE2d 444) (1994). And, the Court of Appeals stated that, as charged in Count 4, there was no specific intent requirement for the crime of simple assault.

The Court of Appeals was correct in so stating. This Court has on multiple occasions noted that the crime of simple assault as set forth in OCGA § 16-5-20 (a) (2), "does not require proof of specific intent. The State need only prove that the defendant possessed a 'general intent to injure' with the weapon. [Cit.]" *Guyse*, supra at 577 (2). See also *Turner v. State*, 281 Ga. 487, 489 (1) (b) (640 SE2d 25) (2007) ("[T]he State is not required to prove specific intent; the issue is whether defendant possessed a general intent to injure. [Cit.]"); *Stoddard v. State*, 272 Ga. 608, 611-612 (3) (533 SE2d 379) (2000) ("There is an intent of the accused that must be shown, but it is only the criminal intent to commit the acts which caused the victim to be reasonably apprehensive of receiving a violent injury, not any underlying intent of the accused in assaulting the victim. [Cit.]"). Accord *Jackson v. State*, 276 Ga. 408, 412 (2) (fn. 5) (577

(1) It is established by proof of the same or less than all the facts or a less culpable mental state than is required to establish the commission of the crime charged; or (2) It differs from the crime charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpability suffices to establish its commission.

SE2d 570) (2003) (overruled on other grounds, *State v. Springer*, 297 Ga. 376 (774 SE2d 106) (2015)); *Dunagan v. State*, 269 Ga. 590, 594 (2) (502 SE2d 726) (1998); *Adsitt v. State*, 248 Ga. 237, 240 (6) (282 SE2d 305) (1981). And, Patterson's general intent to injure was shown by the evidence of his offensive use of the vehicle. See *Johnson v. State*, 289 Ga. 650, 651-652 (1) (715 SE2d 99) (2011).

Nor have our repeated statements regarding general intent under OCGA § 16-5-20 (a) (2) been made by happenstance. Rather, when squarely faced with a claim that a specific intent to cause apprehension is required when the defendant is alleged to have committed aggravated assault based on the victim's reasonable apprehension of harm under OCGA § 16-5-20 (a) (2), this Court has squarely stated that "[a]ll that is required is that the assailant intend to commit the act which in fact places another in reasonable apprehension of injury, not a specific intent to cause such apprehension. [Cit.]" *Smith v. State*, 280 Ga. 490, 492 (1) (629 SE2d 816) (2006). And, this conclusion regarding the requirements of OCGA § 16-5-20 (a) (2) is demanded by the simple fact that no requirement of a specific intent is set forth in OCGA § 16-5-20 (a) (2). The statutory language is plain and unequivocal; a person who commits an act that

6

places another in reasonable apprehension of receiving a violent injury has committed simple assault under OCGA § 16-5-20 (a) (2). See *O'Neal v. State*, 288 Ga. 219, 220-221 (702 SE2d 288) (2010); *Glover v. State*, 272 Ga. 639, 640 (533 SE2d 374) (2000). And, this Court has previously addressed the genesis of OCGA § 16-5-20 (a) (2), observing in *Rhodes v. State*, 257 Ga. 368, 369 (4) (359 SE2d 670) (1987), that in enacting OCGA § 16-5-20 (a) (2) in 1968, the General Assembly effected "a substantial change . . . in the definition of aggravated assault, as defined in the Criminal Code." In addressing a claim that the defendant's act was the crime of pointing a gun or pistol at another, and not the crime of aggravated assault, *Rhodes* noted that before the adoption of the Criminal Code in 1968,

> simple assault was defined as "an attempt to commit a violent injury on another." Code Ann. § 26–1301 (now OCGA § 16–5–20 (a) (1)). Aggravated assault then was defined as an assault with intent to murder, rape, or rob. Code Ann. § 26–1302(a)(1) (now OCGA § 16–5–21[(b)](1)). There was no analog to OCGA §§ 16–5–20(a)(2) or 21[(b)](2). Thus, pointing a firearm at another without legal justification *and without intent to murder, rape, or rob* was always a misdemeanor, whether or not the victim was apprehensive of being injured. The 1968 codification included Code Ann. §§ 26–1301(a)(2) and 26–1302(a)(2), now codified as OCGA §§ 16–5–20 (a)(2) and 21[(b)](2), and *established that the use of a deadly weapon in such manner as to place another in reasonable apprehension of immediate violent injury constitutes the felony of*

7

*aggravated assault.*

Id. (Emphasis supplied.) Thus, *Rhodes* stands for the proposition that OCGA §

16-5-20 (a) (2) means simply what it says; a person commits simple assault by

committing "an act which places another in reasonable apprehension of

immediately receiving a violent injury."[7]

Notwithstanding these precedents, Patterson urges that this Court should

nonetheless interpret OCGA § 16-5-20 (a) (2) to include a requirement that the

defendant have the specific intent to cause the victim to be apprehensive of

receiving a violent injury. But, despite this request, OCGA § 16-5-20 (a) (2)

simply does not state that a defendant must *intend* to place the victim in

reasonable apprehension of receiving a violent injury. And, at the time of the

1968 enactment of OCGA § 16-5-20 (a) (2), the General Assembly certainly

knew how to phrase a statute to include a requirement that an act must be made

---

[7] In *Rhodes*, this Court noted that the defendant's "own testimony ("I was showing the gun to him so he would leave me alone.") revealed that his purpose in pointing the weapon was to place [the victim] in apprehension of immediate violent injury." *Rhodes*, supra at 370 (6). However, this observation was made immediately after reciting that the deceased victim, and those who were with him in his car, perceived the threat posed by the defendant's actions; this, together with the discussion and analysis undertaken in the previous divisions of *Rhodes*, makes clear that this Court's notation that the defendant intended the victim to apprehend an injury was simply a comment about the quantum of evidence in the case, not the creation of an element of the crime beyond that set forth in the language of current OCGA § 16–5–20 (b) (2).

8

with a specific intent, as can be seen in the requirement of simultaneously-enacted OCGA § 16-5-21 (b) (1) that an aggravated assault under that provision be done "[w]ith intent to murder, rape, or to rob," and we therefore conclude that the General Assembly simply chose not to include a requirement of specific intent in OCGA § 16-5-20 (a) (2). *Hayes v. State*, 298 Ga. 98, 104 (2) (b) (779 SE2d 609) (2015); *Fair v. State*, 284 Ga. 165, 168 (2) (b) (664 SE2d 227) (2008). If language changing the required intent of the defendant is to be inserted into the text of OCGA § 16-5-20 (a) (2), it is for the General Assembly to do it, not this Court.[8]

Thus, the Court of Appeals was correct in determining that, as to Count 4,

---

[8] Although this Court's opinion in *Rhodes* was written 19 years after the 1968 passage of what is now OCGA § 16–5–20 (a) (2), beginning shortly after the enactment of OCGA § 16–5–20 (a) (2), the Court of Appeals regularly decided cases also applying the statute as written, i.e.,without grafting into the crime of simple assault the additional element that the defendant must intend that his or her act place another in reasonable apprehension of immediately receiving a violent injury. See *Johnson v. State*, 122 Ga. App. 542 (1) (178 SE2d 42) (1970). See also *Brooks v. State*, 144 Ga. App. 97, 99 (3) (240 SE2d 593) (1977); *Hise v. State*, 127 Ga. App. 511 (194 SE2d 274) (1972). Patterson contends in this Court that the 1968 Committee Notes to what is now OCGA § 16–5–20 suggest a legislative intent to include a requirement that the defendant have a specific intent to cause the victim reasonable apprehension of immediately receiving a violent injury, but the Notes do not state that there was such a legislative intent, and the General Assembly has not, in the 46 years since the Court of Appeals's decision in *Johnson*, supra, or the 29 years since this Court's decision in *Rhodes*, supra, taken any opportunity to insert into the language of OCGA § 16–5–20 (a) (2) that which Patterson wishes to be placed there.

9

the State was required to show that Patterson intended to drive his van in the direction of Silvers, that Silvers was placed in reasonable apprehension of injury, and that the van was an object that when used offensively against a person,[9] was likely to or actually did result in serious bodily injury. The State was not required to show an intent to injure or that Patterson intended to place Silvers in reasonable apprehension of injury.

*Patterson*, supra at 226 (2).[10]

Judgment affirmed.  All the Justices concur, except Melton, Nahmias, and Blackwell, JJ., who dissent.

---

[9] We note that the dissent raises certain hypothetical scenarios that it contends could result in the commission of aggravated assault through ordinary behavior, but does so without any acknowledgment of this element of the offense.  Any consideration of the meaning of the language "when used offensively against a person" as stated in current OCGA § 16–5–21 (b) (2) is beyond the scope of this Court's grant of certiorari.

[10] Given our answer to the first question this Court posed on certiorari, we need not address the second question.

S15G1303. PATTERSON v. THE STATE.

BLACKWELL, Justice, dissenting.

Enacted in 1968, OCGA § 16-5-20 (a) (2) provides that an "act which places another in reasonable apprehension of immediately receiving a violent injury" is a simple assault. The statute says nothing expressly about the intent with which such an act must be done, and so, it was left for the courts to discern the requisite state of mind. When read in context as an ordinary reader would do, the statute most naturally and reasonably is understood to require a specific intent, either to inflict injury or to arouse an apprehension of injury. But beginning with Dunagan v. State, 269 Ga. 590 (502 SE2d 726) (1998), this Court has held in a number of cases — without any meaningful analysis of the relevant statutory context — that simple assault by an act that places another in reasonable apprehension of imminent and violent injury requires no specific intent, only a general intent to do the act that happens to produce apprehension. In those cases, we adopted a law of criminal assault that effectively amounts to strict liability, recognizing a form of assault so broad that, but for the grace of prosecuting attorneys, it would make felons of most Georgians. Today, we have

occasion to reconsider our precedents, and I would overrule <u>Dunagan</u> and its progeny. A majority of the Court, however, has determined to stand by those precedents. I respectfully dissent.

1. Ricky Patterson and Wanda Bartley were involved romantically, and they lived together in a mobile home near Dalton. On November 1, 2011, Patterson returned from work to find that Bartley had been remodeling the home without him and drinking beer with her adult son, Nathaniel Silvers. Patterson and Bartley began to argue, and at some point, Patterson became quite angry, taking a roast from the oven and throwing it on the ground, and smashing a glass cabinet with a cell phone. Bartley asked Patterson to leave, and eventually, Patterson walked outside and got into his Chevrolet van, which was parked about 20 feet from the home. Patterson started the van, shifted into a low gear, revved the engine, and accelerated quickly, driving toward one end of the mobile home. Although the precise sequence of events is unclear, Silvers stepped off the porch around the same time and proceeded into the yard adjacent to that same end of the mobile home, where he was struck by the van. The van pinned Silvers against the mobile home, leaving him with serious injuries from which he recovered only after a hospital stay.

2

Patterson was indicted, tried by a Whitfield County jury, and convicted of aggravated assault for having driven a motor vehicle toward Silvers, causing Silvers to apprehend injury.[11] By definition, an aggravated assault requires a simple assault and a statutory aggravating circumstance, see Guyse v. State, 286 Ga. 574, 576 (2) (690 SE2d 406) (2010), and in this instance, the aggravated assault of which Patterson was convicted was predicated upon simple assault by placing another in reasonable apprehension of an imminent and violent injury, as provided in OCGA § 16-5-20 (a) (2).[12] At trial, Patterson did not deny that he had driven the van carelessly, but the evidence that he meant to hurt Silvers or even to frighten him was disputed.[13] Patterson conceded that he might be guilty

---

[11] Patterson was convicted of disorderly conduct as well. The jury also found Patterson guilty of two simple assaults, although those assaults merged into the aggravated assault of which he was convicted. The jury acquitted Patterson of several other crimes, including aggravated battery.

[12] The aggravating circumstance was that Patterson committed the assault by use of an "object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury," former OCGA § 16-5-21 (a) (2), namely, a motor vehicle. See, e.g., Guyse, 286 Ga. at 577 (2). See also Durrance v. State, 250 Ga. App. 185, 187 (2) (549 SE2d 406) (2001) ("Although an automobile is not per se a deadly or offensive weapon, it may become one depending on the manner and means by which the vehicle is used. The question of whether an automobile has been used in such a manner so as to constitute a deadly or offensive weapon is one for the jury to resolve." (Citations omitted)).

[13] The jury would have been authorized to infer an intent to injure or cause apprehension of injury simply from the fact that Patterson intentionally drove his van in the direction of Silvers. See, e.g., Turner v. State, 281 Ga. 487, 489 (1) (b) (640 SE2d 25) (2007). See also Smith v. State, 284 Ga. 33, 36 (3) (663 SE2d 155) (2008) (jury may infer that "the acts of a person of sound mind and discretion are the product of that person's will" and that "[a] person of sound mind and discretion

3

of reckless conduct or reckless driving, but unless the State proved beyond a reasonable doubt that he intended to inflict an injury or cause Silvers to apprehend injury, Patterson urged that he could not properly be guilty of aggravated assault. Consistent with that approach, Patterson asked the trial court to charge the jury on reckless conduct and reckless driving as lesser offenses included in aggravated assault. The trial court refused that request.

After he was convicted and sentenced, Patterson appealed, contending that the trial court erred when it refused to charge the jury on reckless conduct and reckless driving. In Patterson v. State, 332 Ga. App. 221 (770 SE2d 62) (2015), the Court of Appeals rejected that contention and affirmed. Relying on cases from the line that traces back to Dunagan, the Court of Appeals said that aggravated assault by an act that places another in reasonable apprehension of imminent and violent injury requires no intent to inflict injury or cause such apprehension, only an intent to do the act, which, in this case, was the act of

---

intends the natural and probable consequences of those acts"). Moreover, an inmate testified that Patterson had admitted in jail that he struck Silvers intentionally, and there was evidence that Bartley and Silvers originally had characterized the incident as "intentional." On the other hand, there was evidence that Silvers later characterized the incident as unintentional and an "accident," that the van was loaded with tools and had worn tires, that the rear tires lost traction on the wet grass as the van accelerated, that Patterson appeared to lose control of the van, and that Patterson and Silvers had a good relationship.

4

driving. See id. at 224-225 (2). Because reckless conduct and reckless driving in the circumstances of this case likewise would require a general intent to drive, the Court of Appeals reasoned, those offenses did not involve a "less culpable mental state than that which was required to establish the commission of the [aggravated assault] as charged." Id. at 228-229 (2) (b), (c). Accordingly, the Court of Appeals concluded, there was no error in the refusal to charge the jury on reckless conduct and reckless driving as lesser offenses included in the aggravated assault. See id. at 229 (2) (b), (c). Patterson filed a petition for a writ of certiorari, and we granted the petition specifically to reconsider Dunagan and its progeny and to revisit the question of the intent required for an assault under OCGA § 16-5-20 (a) (2).

2. This case concerns the meaning of OCGA § 16-5-20 (a) (2), and so, our analysis ought to begin with the familiar and settled principles that inform our consideration of statutory meaning. "[A] statute draws its meaning from its text," Zaldivar v. Prickett, 297 Ga. 589, 591 (1) (774 SE2d 688) (2015) (citation and punctuation omitted), and when we look to the statutory text, "we must presume that the General Assembly meant what it said and said what it meant." Deal v. Coleman, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and

5

punctuation omitted). To that end, "we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." FDIC v. Loudermilk, 295 Ga. 579, 588 (2) (761 SE2d 332) (2014) (citation and punctuation omitted). "The common and customary usages of the words are important, but so is their context." Chan v. Ellis, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (citations omitted). "After all, context is a primary determinant of meaning." May v. State, 295 Ga. 388, 391 (761 SE2d 38) (2014) (citation and punctuation omitted). "For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." Tibbles v. Teachers Retirement System of Ga., 297 Ga. 557, 558 (1) (775 SE2d 527) (2015) (citation and punctuation omitted). Considering the text and relevant context of the statute, our task is to discern the way in which the statute most naturally and reasonably would have been understood at the time of its enactment. See Warren v. State, 294 Ga. 589, 590 (755 SE2d 171) (2014). With these principles in mind, I turn now to the text and relevant context of OCGA § 16-5-20 (a) (2),

6

starting with the state of the law concerning criminal assault as of 1968, when paragraph (a) (2) was enacted.

(a) At common law, a criminal assault was an attempted battery, see Brundage v. United States, 365 F2d 616, 619 (10th Cir. 1966), that is, "an attempt or offer to beat another, without touching him." 3 William Blackstone, Commentaries on the Laws of England 120 (1st ed. 1768).[14] See also United States v. Bell, 505 F2d 539, 540 (7th Cir. 1974) ("A criminal assault at common law was originally an attempt to commit a battery."); Anderson v. Crawford, 265 F 504, 507 (8th Cir. 1920) ("An assault is an attempt, which, if consummated, would result in a battery."). Such an assault required a specific intent to inflict injury or, put another way, "the desire or wish to bring about a serious bodily injury to the person of the other." Brundage, 365 F2d at 619. As one of the early American cases explains,

> The definition of an assault [at common law] is an offer or attempt by force to do a corporal injury to another; as if one person strike at another with his hands, or with a stick, and misses him; for, if the other be stricken, it is a battery, which is an offence of a higher

---

[14] When Blackstone spoke of "an attempt or offer to beat another, without touching him," he was referring to the tort of assault, as it was understood at common law in England. Blackstone explained, however, that criminal assault was of the same nature as the tort of assault. See 4 Blackstone, Commentaries on the Laws of England 216-217 (1st ed. 1769).

7

grade. Or if he shake his fist at another, or present a gun, or other weapon, within such distance as that a hurt might be given; or drawing a sword, and brandishing it in a menacing manner. But it is essential to constitute an assault, that an intent to do some injury should be coupled with the act; and that intent should be to do a corporal hurt to another.

United States v. Hand, 26 F. Cas. 103, 104 (C.C.D. Pa. 1810) (citation omitted).

In time, the law of torts came to recognize another variety of assault, one that involves an act that places another in apprehension of an imminent injury. As early as 1934, the Restatement (First) of Torts acknowledged this kind of assault, noting that "[a]n act other than the mere speaking of words which, directly or indirectly, is a legal cause of putting another in apprehension of an immediate and harmful or offensive contact makes the actor liable to the other for the apprehension so caused." Restatement (First) of Torts § 21 (1) (1934). Dean Prosser recognized the same sort of assault in his seminal treatise on the law of torts, although he understood the assault ordinarily to require that the apprehension of injury be a reasonable one:

Any act of such a nature as to excite an apprehension of a battery may constitute an assault. It is an assault to shake a fist under another's nose, to aim or strike at him with a weapon, or to hold it in a threatening position, to rise or advance to strike another, to surround him with a display of force, to chase him in a hostile

8

manner, or to lean over a woman's bed and make indecent proposals, in such a way as to put her in fear.

Since the interest involved is the mental one of apprehension of contact, it should follow that the plaintiff must be aware of the defendant's act at the time, and that it is not an assault to aim a gun at one who does not discover it. Apprehension is not the same thing as fear, and the plaintiff is not deprived of his action merely because he is too courageous to be frightened or intimidated. . . .

At the same time, the courts have been reluctant to protect extremely timid individuals from exaggerated fears of contact, and seem to have required quite uniformly that the apprehension be one which would normally be aroused in the mind of a reasonable person. Perhaps if the defendant has knowledge of the plaintiff's peculiar and abnormal timidity, and intends to act upon it, there may be liability, but at least in the absence of such knowledge, there is no assault. Thus it is usually held that the defendant's act must amount to an offer to use force, and there must be an apparent ability and opportunity to carry out the threat immediately. . . .

William L. Prosser, The Law of Torts § 10 (2nd ed. 1955) (footnotes omitted).

In 1965, the Restatement (Second) of Torts also acknowledged that an act that places another in "imminent apprehension" of "a harmful or offensive contact" may form the basis for liability in tort for an assault. Restatement (Second) of Torts § 21 (1) (1965). At least by the late 1960s, the tort of assault by putting another in apprehension of an imminent injury appears to have been generally accepted. See Madden v. D.C. Transit System, 307 A2d 756, 757 (D.C. 1973).

9

At that time, however, it was equally accepted in the law of torts that such an assault requires a specific intent, either to actually inflict injury, or to arouse an apprehension of injury. The Restatement (First) recognized that assault by an act that causes another to apprehend injury necessarily requires that "the actor intends to inflict a harmful or offensive contact upon the other or a third person or to put the other or a third person in apprehension thereof." Restatement (First) of Torts § 21 (1) (a). The Restatement (Second) likewise conditioned liability in tort upon one having "act[ed] intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact." Restatement (Second) of Torts § 21 (1) (a). Each of the Restatements recognized that, in the absence of such a specific intent, there was no liability for assault, even though "the act involves an unreasonable risk of causing [an imminent apprehension of injury] and, therefore, would be negligent or reckless if the risk threatened bodily harm." Restatement (Second) of Torts § 21 (2). Accord Restatement (First) of Torts § 21 (2). Dean Prosser agreed, explaining:

> There is, properly speaking, no such thing as a negligent assault.
> But the intent need not necessarily be to inflict physical injury, and
> it is enough that there is an intent to arouse apprehension. Thus it is

10

an assault to fire a gun not aimed at the plaintiff for the purpose of frightening him, or to point it at him when the defendant knows that it is unloaded, and the plaintiff does not.

Prosser, supra, at § 10 (footnotes omitted).

As the notion of an assault by an act that places another in apprehension of imminent injury gained acceptance in the law of torts, it made its way into the criminal law. See United States v. Rizzo, 409 F2d 400, 403 (7th Cir. 1969), disapproved on other grounds by Simpson v. United States, 435 U. S. 6, 11 (II), n.6 (98 SCt 909, 55 LE2d 70) (1978). See also Bell, 505 F2d at 540. In 1958, the United States Supreme Court observed that a criminal assault under federal law consists of "putting another in apprehension of harm whether or not the actor actually intends to inflict or is capable of inflicting that harm." Ladner v. United States, 358 U. S. 169, 177 (79 SCt 209, 3 LE2d 199) (1958). Even so, it was understood that such apprehension had to be reasonable for purposes of criminal assault, just as for assault in the law of torts. See Rizzo, 409 F2d at 403 ("It is usually required that the apprehension of harm be a reasonable one." (Citations omitted)). Likewise, the criminal law appears to have assimilated the notion that an assault by placing another in apprehension of an imminent injury required a specific intent to arouse such apprehension, if not an intent to actually

11

inflict injury. See <u>United States v. Beasley</u>, 438 F2d 1279, 1282 (6th Cir. 1971), disapproved on other grounds by <u>Simpson</u>, 435 U. S. at 11 (II), n.6 (explaining that robbery was aggravated by assault where "the robber is shown to have possessed the intent to generate apprehension on the part of his victim, and where the victim, in fact, is shown to have been placed in reasonable apprehension by the robber's conduct, regardless of the robber's ability actually to inflict harm").

The general acceptance of these ideas as a matter of criminal law was not limited to the federal courts. In 1962, these principles were incorporated into the Model Penal Code, which provided that one committed simple assault by "attempt[ing] by physical menace to put another in fear of imminent serious bodily injury." Model Penal Code § 211.1 (1) (c). Moreover, by the late 1960s, most American jurisdictions had come to recognize criminal assault by an act arousing apprehension of imminent injury, as well as the traditional sort of criminal assault involving an attempt to inflict injury. See <u>Bell</u>, 505 F2d at 540 (citing criminal law treatises published in the 1930s, 1940s, 1950s, and 1960s). In those jurisdictions, a criminal assault "consisted either of an actual attempt to commit a battery or of an intentional subjection of another to reasonable

12

apprehension of receiving a battery." Commentaries to the Model Penal Code, Part II, § 211.1, comment (1) (b) (1980). As one modern commentator has noted,

> It is sometimes stated that this type of assault is committed by an act (or by an unlawful act) which reasonably causes another to fear immediate bodily harm. This statement is not quite accurate, however, for one cannot (in those jurisdictions which have extended the tort concept of assault to criminal assault) commit a criminal assault by negligently or even recklessly or illegally acting in such a way (as with a gun or a car) as to cause another person to become apprehensive of being struck. There must be an actual intention to cause apprehension, unless there exists the morally worse intention to cause bodily harm.

Wayne R. LaFave, 2 Substantive Criminal Law § 16.3 (b) (2nd ed. 2003) (footnotes omitted). See also 6A CJS Assault § 82 ("Generally, an intent to injure or to cause a reasonable apprehension of bodily injury is an essential element of the offense." (Footnote omitted)); 6 AmJur2d Assault and Battery § 17 ("[A]ssault of the intentional frightening variety is a specific intent crime. It must be proved that the defendant intended to create an apprehension in the victim by threatening conduct." (Footnotes omitted)).

These trends played out in Georgia as well. In 1833, the General Assembly enacted a Penal Code that defined assault as "an attempt to commit

13

a violent injury on the person of another," Ga. L. 1833, p. 153, consistent with the notion of a criminal assault at common law in England. For the next 135 years, our statutory law defined criminal assault exclusively in those terms. See, e.g., Code of 1863, § 4256; Code of 1868, § 4291; Code of 1873, § 4357; Code of 1882, § 4357; Penal Code of 1895, § 95; Penal Code of 1910, § 95; Code of 1933, § 26-1401. Even so, this Court in several cases endorsed the idea that criminal assault was not limited to circumstances in which the accused had an "actual present ability" to inflict injury, but extended as well to cases in which the accused had "a reasonably apparent present ability, so as to create an apprehension that the injury may be inflicted." Thomas v. State, 99 Ga. 38, 42 (26 SE 748) (1896) (citation omitted).

Although these cases were decided under statutory law that defined criminal assault solely in terms of an attempted battery, they are far more consistent with the notion of criminal assault as an act that places another in reasonable apprehension of an imminent and violent injury. For instance, this Court held in Crumbley v. State, 61 Ga. 582, 584 (1878), that firing a shotgun toward the engineer of a passing locomotive — an act that produced a visible response from the engineer — was an assault, notwithstanding that the shotgun

14

was only loaded with powder and was not, therefore, actually capable of inflicting injury from a distance. Likewise, in Thomas, this Court affirmed an assault conviction upon evidence that the accused had threatened to beat a woman about the head, raised a stick, and started toward her, notwithstanding that the accused never got closer to the woman than about twenty-five steps. 99 Ga. at 40-41. In Robinson v. State, 118 Ga. 750, 750 (45 SE 620) (1903), we affirmed a conviction for assault in a case in which the accused drew back his hand as if he were about to strike the victim with a bottle that he was grasping, citing Thomas and explaining that it was for the jury to decide whether the accused had the "apparent ability" to strike the victim, "his demonstration causing her to entertain reasonable fear of injury to secure her safety." Although we attempted to couch these decision in terms of a criminal assault at common law — exactly as the statutory law then defined criminal assault — commentators later would come to recognize these decisions as a judicial recognition of a different sort of criminal assault, assault by an act placing another in reasonable apprehension of injury. See, e.g., Commentaries to the Model Penal Code, supra, Part II, § 211.1, n.19 (citing Crumbley as support for the proposition that most jurisdictions had defined criminal assault as "either . . .

15

an actual attempt to commit a battery or . . . an intentional subjection of another to reasonable apprehension of receiving a battery").

In recognizing criminal assault as an act that arouses an apprehension of injury, we did not dispense with the requirement of a specific intent. To the contrary, in Crumbley, although we appear to have accepted that the accused had no intent to actually inflict an injury, we pointed out that he had expressed an intent "to have a little fun out of the engineer," presumably by causing the engineer to apprehend injury. 61 Ga. at 584. In Thomas, we cited approvingly a California decision and two English cases for the proposition that an apparent ability to inflict injury was sufficient, but we noted that, in each of those cases, the accused had an intent to inflict injury. See 99 Ga. at 43 (citations omitted). And in Dorsey v. State, 108 Ga. 477, 479 (34 SE 135) (1899), we stated explicitly that, "[t]o constitute an assault no actual injury need be shown, it being only necessary to show an intention to commit an injury, coupled with an apparent ability to do so," citing Thomas. Our Court of Appeals likewise understood these decisions to retain the requirement of specific intent. See, e.g., Harrison v. State, 60 Ga. App. 610, 612 (1) (4 SE2d 602) (1939); Godboult v. State, 38 Ga. App. 137, 138 (142 SE 704) (1928); Edwards v. State, 4 Ga. App.

16

167, 168-170 (1) (60 SE 1033) (1908). With this historical context in mind, I turn now to the enactment of OCGA § 16-5-20 (a) (2).

(b) Amid concerns that the existing statutory law was contributing to "confusion in the field of criminal law,"[15] the General Assembly commissioned a Criminal Law Study Committee in 1961 to undertake a "thorough study of the criminal laws" and to recommend "a revision of the laws relative to criminal law and procedure," with an eye toward eliminating "ambiguities and inconsistencies." Ga. L. 1961, p. 96. After several years of study, the Study Committee proposed a comprehensive revision of the statutory law that retained "as many [of the existing statutes] as possible," but also reflected the decisions of the Georgia courts interpreting the existing statutory law, the Model Penal Code, and "the weight of the authority in other states." Ga. Code Ann. bk. 10, tit. 26, p. 3, Criminal Law Study Committee Foreword (Harrison 1988).[16] Based on the work of the Study Committee, the General Assembly in 1968 enacted a comprehensive revision of the criminal laws. See Ga. L. 1968, p. 1249.

---

[15] In particular, there were concerns that much of the existing statutory law had become "completely obsolete," that "many criminal laws are unnecessarily verbose, some are difficult of distinction, many are overlapping[,] and others are extremely difficult to interpret." Ga. L. 1961, p. 96.

[16] The report and notes of the Study Committee formerly were published in the Code.

17

As a part of that revision, the General Assembly adopted the provisions now codified at OCGA § 16-5-20 (a), which recognize simple assaults of two varieties. As presently codified, paragraph (a)(1) carries forward the notion of criminal assault as it was understood at common law and as it had been defined in the statutory law of Georgia since 1833, providing that an "attempt[] to commit a violent injury to the person of another" is simple assault. Paragraph (a)(2), on the other hand, adopts the alternative definition of criminal assault as an "act which places another in reasonable apprehension of immediately receiving a violent injury." Although the 1968 enactment marks the first explicit acknowledgment in our statutory law of criminal assault by an act that arouses a reasonable apprehension of imminent and violent injury, recall that this Court already had effectively recognized that sort of assault by judicial decision, even under statutory law that defined assault exclusively in terms of an attempt to inflict injury. When it proposed this revision of the statutory law concerning assault, the Criminal Law Study Committee reported to the General Assembly that the revision "is the former Georgia law," citing Crumbley and Thomas. Ga. Code Ann. bk. 10, Committee Notes, Ch. 26-13, p. 359 (Harrison 1988).

18

Moreover, the Committee acknowledged that this proposed revision also was "the law in a majority of the American States." Id.

For the present purposes, a few additional provisions of the 1968 enactment are noteworthy. The General Assembly for the first time provided that a simple assault "with a deadly weapon" was aggravated assault, a provision now codified at OCGA § 16-5-21. In light of that provision, and consistent with the charge of the Criminal Law Study Committee to avoid inconsistencies and overlapping laws, the General Assembly contemporaneously repealed the former statute that made "shooting at another" a crime. See Code of 1933, § 26-1702. The 1968 enactment, however, carried forward the provision now codified at OCGA § 16-11-102, which forbids "intentionally and without legal justification point[ing] or aim[ing] a gun or pistol at another, whether the gun or pistol is loaded or unloaded." And for the first time, the General Assembly enacted a statute concerning reckless conduct, now codified at OCGA § 16-5-60 (b), which makes it a misdemeanor for any person to "cause[] bodily harm to or endanger[] the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross

19

deviation from the standard of care which a reasonable person would exercise in the situation." With these things in mind, I now turn back to the question of the intent required for a simple assault under OCGA § 16-5-20 (a) (2).

(c) To answer that question, one must ascertain the meaning of the statutory text, as it would have been most naturally and reasonably understood at the moment of its enactment in 1968. See Warren, 294 Ga. at 590. That meaning cannot be discerned simply by reading the words of OCGA § 16-5-20 (a) (2) with contemporary eyes and without regard to context. History and context always matter, see Chan, 296 Ga. at 839 (1), and in this instance, history and context are everything.

The text of OCGA § 16-5-20 (a) (2) says nothing explicit about the requisite state of mind for a simple assault by an act that arouses a reasonable apprehension of imminent and violent injury.[17] But in Georgia law, every crime

---

[17] Contemporary eyes might perceive an explicit reference to specific intent in OCGA § 16-5-20 (a) (1), which speaks of an "attempt" to inflict a violent injury, and having perceived such a reference, one might infer that the absence of a like reference in OCGA § 16-5-20 (a) (2) was meant to signal that an assault by an act that arouses an apprehension of injury requires no such intent. There are three reasons to doubt the soundness of such an inference. First, such an inference draws upon the modern understanding that a criminal attempt necessarily involves a specific intent to commit the crime attempted. Recall, however, that OCGA § 16-5-20 (a) (1) carried forward verbatim a provision that had been a part of our statutory law since 1833, whereas the statutory law included no general provision for criminal attempts until the enactment of the 1968 revision. See OCGA § 16-4-1. The idea that OCGA § 16-5-20 (a) (1) can be properly understood by reference to modern conceptions of criminal attempt is, therefore, highly questionable. Second, recall as well that, even

20

necessarily must involve "a joint operation of an act or omission to act and intention or criminal negligence," OCGA § 16-2-1 (a), and so, the absence of an express provision about intent or criminal negligence means only that the requisite state of mind is implied, and it is for the courts to discern that state of mind. Here, the implication seems clear enough. The text of OCGA § 16-5-20 (a) (2) plainly refers to a form of criminal assault that first appeared in the law of torts, had been incorporated over time into American criminal law generally, and had been acknowledged for many years in the decisional law of this Court. By 1968, it was settled in the law of torts that this form of assault required a specific intent, either to inflict injury or to arouse an apprehension of injury. See generally Prosser, supra, at § 10. As the concept has been incorporated into American criminal law, it is equally settled that it requires such an intent. See generally LaFave, supra, at § 16.3 (b). And as it was recognized in the decisional

when the provision now codified at OCGA § 16-5-20 (a) (1) was the *only* way in which our statutory law defined criminal assault, this Court decided in Crumbley that an assault did not always require a specific intent to actually inflict violent injury, but instead could be premised on an intent to arouse apprehension of injury. Crumbley is inconsistent with the idea that the statutory reference to "attempt" was meant to convey the modern notion that an attempt always requires a specific intent to commit the crime attempted. Finally, recall too that criminal assault by an act arousing apprehension was recognized in our decisional law long before it was made a part of the statutory law of Georgia, and yet, our precedents never purported to dispense with the requirement of a specific intent. I do not think that the reference to "attempt" in OCGA § 16-5-20 (a) (1) can be naturally or reasonably understood to signal anything about the intent required for a simple assault under OCGA § 16-5-20 (a) (2).

21

law of Georgia, it appears to have been understood to require an intent to inflict injury, see <u>Dorsey</u>, 108 Ga. at 479, or at the least, an intent to arouse apprehension. See <u>Crumbley</u>, 61 Ga. at 584. Generally speaking,

> where [the legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

<u>Morissette v. United States</u>, 342 U. S. 246, 263 (I) (72 SCt 240, 96 LE 288) (1952). The provision of OCGA § 16-5-20 (a) (2) refers to a variety of assault that was firmly entrenched in American law generally and recognized in the decisions of this Court by the time the statute was enacted, and in the absence of any explicit provision otherwise, the statute is most naturally and reasonably understood to adopt the intent required under that settled body of preexisting law.

The notes of the Criminal Law Study Committee that accompanied the legislation adopting OCGA § 16-5-20 (a) (2) confirm that it was, in fact, understood in just that way at the time of enactment. According to those notes,

22

the provision now codified at OCGA § 16-5-20 (a) (2) "is the former Georgia law," and in support of that notation, the Committee cited Crumbley and Thomas. Equally significant, having undertaken a comprehensive study of not only existing Georgia law, but also the "weight of the authority in other states," the Committee reported that the statute was consistent with "the law in a majority of the American States." Without a requirement of specific intent, however, that simply would not have been true.

Other provisions of the 1968 comprehensive revision of the criminal laws also support this view. Recall that the General Assembly also enacted statutes concerning reckless conduct and the intentional pointing of a gun at another as a part of the 1968 revision. Recall as well that the revision was intended, among other things, to eliminate inconsistent and overlapping laws to the extent possible. If assault under OCGA § 16-5-20 (a) (2) required no intent to inflict injury or arouse apprehension, the overlap between that statute and the statutes concerning reckless conduct and intentionally pointing a gun at another would be substantial, as further discussed later in this dissent.

In view of the statutory text and its relevant context, OCGA § 16-5-20 (a) (2) is most naturally and reasonably understood to require that a simple assault

by an act that arouses a reasonable apprehension of imminent and violent injury requires an intent either to inflict injury or to arouse apprehension. If we were writing on a clean slate, I would readily conclude that such a specific intent is an essential element of simple assault under OCGA § 16-5-20 (a) (2). We are not, however, writing on a clean slate. Accordingly, I now turn to our prior decisions touching upon this subject.

3. Starting with Dunagan, this Court has held in several cases that OCGA § 16-5-20 (a) (2) requires only a general intent to do the act that happens to arouse apprehension. A proper consideration of these precedents must begin, however, with Rhodes v. State, 257 Ga. 368 (359 SE2d 670) (1987), a decision that predates Dunagan by more than a decade. In Rhodes, the defendant was convicted of malice murder by shooting, and he claimed on appeal that the trial court should have charged involuntary manslaughter as a lesser included offense, reasoning that he had caused the death of the victim while in the commission of intentionally pointing a gun at another, a misdemeanor. In rejecting this claim of error, we explained that the evidence showed that the defendant committed aggravated assault, not merely the crime of pointing a gun at another. Examining the difference between aggravated assault by an act that

24

places another in reasonable apprehension of injury and intentionally pointing

a gun at another, we said:

> The aggravated assault definition includes an element not contained in the pointing of a firearm definition, specifically: a resulting reasonable apprehension of immediate violent injury. Thus, if the victim is not placed in reasonable apprehension of immediate violent injury by the pointing of the firearm, only the misdemeanor of pointing a firearm (and not the felony of aggravated assault) has been committed. (This would be the case where the victim was completely unaware that a firearm was pointed at him. On the other hand, if the pointing of the firearm placed the victim in reasonable apprehension of immediate violent injury, the felony of aggravated assault has occurred.)

257 Ga. at 369-370 (5).

In <u>Dunagan</u>, we quoted from that passage in <u>Rhodes</u>: "If the pointing of

a firearm places the victim in reasonable apprehension of immediate violent

injury, the felony of aggravated assault has occurred." 269 Ga. at 593 (2) (b)

(punctuation omitted). Then, without further analysis, we held that

> an assault under [OCGA § 16-5-20 (a) (2)] looks to the victim's state of mind, rather than the accused's, to establish the elements of an assault. There is an intent of the accused that must be shown, but it is only the criminal intent to commit the acts which caused the victim to be reasonably apprehensive of receiving a violent injury, not any underlying intent of the accused in assaulting the victim.

25

Id. at 594 (2) (b).[18] Subsequent cases in which this Court held that OCGA § 16-5-20 (a) (2) requires only a general intent to do the act that arouses apprehension likewise trace back to either <u>Dunagan</u> or <u>Rhodes</u>, and none of the later authorities adds anything meaningful to the analysis. See, e.g., <u>Stobbart v. State</u>, 272 Ga. 608, 611-612 (3) (533 SE2d 379) (2000) (citing <u>Dunagan</u>); <u>Jackson v. State</u>, 276 Ga. 408, 412, n.5 (577 SE2d 570) (2003) (citing <u>Dunagan</u>); <u>Flores v. State</u>, 277 Ga. 780, 784 (3) (596 SE2d 114) (2004) (citing <u>Jackson</u>); <u>Smith v. State</u>, 280 Ga. 490, 491-492 (1) (629 SE2d 816) (2006) (citing line of Court of Appeals cases that was referenced in <u>Dunagan</u> and that leads back to <u>Rhodes</u>); <u>Dryden v. State</u>, 285 Ga. 281, 282 (676 SE2d 175) (2009) (citing <u>Jackson</u>); <u>Guyse</u>, 286 Ga. at 577 (2) (citing <u>Jackson</u>); <u>Walker v. State</u>, 293 Ga. 709, 712-713 (2) (b) (749 SE2d 663) (2013) (citing <u>Jackson</u>); <u>Allaben v. State</u>, 294 Ga. 315, 321 (2) (b) (1) (751 SE2d 802) (2013) (citing <u>Jackson</u> and <u>Walker</u>); <u>State</u>

---

[18] The only other authorities cited in <u>Dunagan</u> for these propositions are two decisions of our Court of Appeals, <u>Gilbert v. State</u>, 209 Ga. App. 483 (433 SE2d 664) (1993), and <u>Osborne v. State</u>, 228 Ga. App. 758 (492 SE2d 732) (1997). Neither adds much to the reliance upon <u>Rhodes</u>. <u>Gilbert</u> does not address the intent of the accused, and it says without any citation of supporting authority that "[i]t is the reasonable apprehension of harm by the victim of an assault by use of a deadly weapon that establishes the crime of aggravated assault." 209 Ga. App. at 484 (1). <u>Osborne</u>, on the other hand, is part of a line of cases that ultimately leads back to <u>Rhodes</u> itself. See 228 Ga. App. at 759 (citing <u>Jordan</u> and <u>Matthews</u>, infra); <u>Matthews v. State</u>, 224 Ga. App. 407, 408 (1) (481 SE2d 235) (1997) (citing <u>Jordan</u>, infra); <u>Jordan v. State</u>, 214 Ga. App. 598, 600 (1) (448 SE2d 917) (1994) (citing <u>Williams</u>, infra); <u>Williams v. State</u>, 208 Ga. App. 12, 13 (430 SE2d 157) (1993) (citing <u>Rhodes</u>).

26

v. Owens, 296 Ga. 205, 210 (3) (a), n.14 (766 SE2d 66) (2014) (citing Jackson). In the end, the soundness of the analysis in Dunagan and its progeny rests entirely upon the idea that Dunagan understood Rhodes correctly. Upon further reflection, however, it is clear that Dunagan did not.

Rhodes plainly holds that the apprehension of the victim is an element that distinguishes an aggravated assault by pointing a gun at another and arousing apprehension of injury from the crime of merely pointing a gun at another, and that certainly is true enough. But Rhodes did not explicitly state that this distinction was the *only* distinction between these offenses. More important, Rhodes said nothing at all about the state of mind required for an assault by an act that arouses a reasonable apprehension of imminent and violent injury. Perhaps that is because Rhodes was a case in which the defendant indisputably had a specific intent to arouse apprehension, and so, no party raised a question about the requisite intent. In the paragraph of Rhodes immediately following the passage upon which Dunagan relied, we said:

> Rhodes' act was clearly the felony of aggravated assault. The testimony showed that [the victim], as well as the three passengers in his car, were aware of and understandably apprehensive of immediate violent injury. *Rhodes' own testimony ("I was showing the gun to him so he would leave me alone.") revealed that his*

27

> *purpose in pointing the weapon was to place [the victim] in*
> *apprehension of immediate violent injury*. The request for a charge
> on misdemeanor manslaughter properly was denied.

257 Ga. at 370 (6) (emphasis supplied). Our specific reference to the intent of

the defendant could be taken to imply that the Court in <u>Rhodes</u> thought that such

an intent *was* essential to an assault by an act arousing reasonable apprehension.

But in any event, that reference makes perfectly clear that <u>Rhodes</u> cannot fairly

be characterized as holding that such intent is not an element of assault under

OCGA § 16-5-20 (a) (2). See <u>State v. Walker</u>, 295 Ga. 888, 893 (764 SE2d 804)

(2014) ("We have repeatedly cautioned that our decisions stand only for the

points raised by the parties and decided by the court. Questions which merely

lurk in the record, neither brought to the attention of the court nor ruled upon,

are not to be considered as having been so decided as to constitute precedents."

(Citations and punctuation omitted)).

4. Even so, <u>Dunagan</u> and its progeny are precedents of this Court, and we

ordinarily "adhere to the principle of stare decisis, which directs the courts to

stand by their prior decisions." <u>Smith v. State</u>, 295 Ga. 120, 121 (757 SE2d 865)

(2014). To be sure, "[t]he application of the doctrine of stare decisis is essential

to the performance of a well-ordered system of jurisprudence." <u>Etkind v. Suarez</u>,

271 Ga. 352, 357 (5) (519 SE2d 210) (1999) (citation omitted). See also State

v. Jackson, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010). As the United States

Supreme Court has explained,

> [v]ery weighty considerations underlie the principle that courts should not lightly overrule past decisions. Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.

Moragne v. States Marine Lines, 398 U. S. 375, 403 (IV) (90 SCt 1772, 26

LE2d 339) (1970). That said, "stare decisis is not an inexorable command,"

Jackson, 287 Ga. at 658 (5) (citation and punctuation omitted), and "sometimes,

there are compelling reasons to reexamine an earlier decision." Smith, 295 Ga.

at 122. After all, "[w]isdom too often never comes, and so one ought not to

reject it merely because it comes late." Henslee v. Union Planters Nat. Bank &

Trust Co., 335 U. S. 595, 600 (69 SCt 290, 93 LE 259) (1949) (Frankfurter, J.,

dissenting). See also Dietz v. Bouldin, ___ U. S. ___, ___ (136 SCt 1885, 195

LE2d 161) (2016) ("All judges make mistakes. (Even us.)"). When we have

occasion to consider whether a precedent of this Court ought to be reexamined,

29

we consider a number of factors, including "the age of the precedent, the reliance interests involved, the workability of the prior decision, and most importantly, the soundness of its reasoning." State v. Hudson, 293 Ga. 656, 661 (748 SE2d 910) (2013) (citation and punctuation omitted). "We also consider the ease with which the People and their elected representatives might overrule our precedents, if they think them incorrect." Lejeune v. McLaughlin, 296 Ga. 291, 298 (2) (766 SE2d 803) (2014). "In the end, we always must balance the importance of having the question *decided* against the importance of having it *decided right*." Smith, 295 Ga. at 122 (citation omitted; emphasis in original). With these principles in mind, I turn now to the question of stare decisis with respect to Dunagan and its progeny.

As for the age of the precedents, Dunagan was decided only 18 years ago, and most of its progeny was handed down in the last ten years. Moreover, many of these cases involved mutually exclusive verdicts, discussed the intent element of assault only in that context, see, e.g., Jackson, 276 Ga. at 412 (2), n.5, and already have been overruled by this Court with respect to their holdings about mutually exclusive verdicts. See State v. Springer, 297 Ga. 376, 383 (2) (774 SE2d 106) (2015) (overruling Jackson, Flores, Dryden, Walker, and Allaben).

30

Revisiting Dunagan and its progeny, therefore, would not disturb precedents that are firmly established and well settled in our jurisprudence. See, e.g., Lejeune, 296 Ga. at 298-299 (2) (overruling 43-year old precedent and its progeny); Georgia Dept. of Natural Resources v. Center for a Sustainable Coast, 294 Ga. 593, 601 (2) (755 SE2d 184) (2014) (overruling precedent that was "less than 20 years old" and citing cases in which the Court overruled precedents that were 29 and 90 years old); Hudson, 293 Ga. at 656-657 (unanimous decision overruling 38-year old precedent). In any event, "without more, that we have been wrong for many years and in many cases is no reason to persist in the error." Lejeune, 296 Ga. at 298-299 (2) (citations omitted).

When the courts speak of reliance interests in the context of stare decisis, they refer to contract interests, property rights, and other substantive rights. See Jackson, 287 Ga. at 658 (5). See also Hudson, 293 Ga. at 661. The proper understanding of a statute defining criminal assault ordinarily implicates no such interests, and the State has identified no reliance interests in this case. To the contrary, at oral argument, the State conceded that, if we were to conclude that Dunagan and its progeny are out of step with the most natural and reasonable understanding of OCGA § 16-5-20 (a) (2) as of the time of its enactment, we

31

ought to adhere to that understanding out of deference to the legislature, notwithstanding our precedents.

About the practicality of the precedents, Dunagan and its progeny lay down a clear and bright rule — the only intent required under OCGA § 16-5-20 (a) (2) is the intent to do the act that happens to place another in apprehension of injury — that can be applied in prosecutions for assault without much difficulty. The precedents, however, are unworkable in another respect. In a recent case, Judge Costa of the Fifth Circuit noted that, as construed by Dunagan and its progeny, OCGA § 16-5-20 (a) (2) "prohibits even negligently causing apprehension of imminent violent injury," which renders the statute an "outlier." United States v. Torres-Jaime, 2016 U. S. App. LEXIS 7271, *25 (5th Cir. 2016) (Costa, J., dissenting). Under Dunagan and its progeny, however, the statute is even more of an outlier than Judge Costa suspected.

According to our precedents, all that is required for a simple assault under OCGA § 16-5-20 (a) (2) is a general intent to do the act. It appears that the act itself need not be otherwise unlawful, inherently wrongful, or unreasonably dangerous. So long as one intended the act, he has committed a simple assault if it happens to put another in reasonable apprehension of an imminent and

32

violent injury. That is true whether or not he intended to inflict injury or arouse such apprehension, whether or not he knew that injury or apprehension was substantially certain, whether or not he was conscious of even a risk that such injury or apprehension might occur, and whether or not he should have known of such a risk. It also is true whether or not injury or apprehension was foreseeable at all. Even if an exceedingly careful and conscientious person were to take every reasonable precaution to ensure that his act would neither injure another nor arouse apprehension of injury, if he missed something through no fault of his own, and if his act, as a result, happens to produce a reasonable apprehension of imminent and violent injury, he would appear to have committed a simple assault under Dunagan and its progeny. Those precedents hold, after all, that only the intent to do the act matters.

Worse still, if an act involves the use of a deadly weapon or an object that is reasonably likely to cause serious injury — a firearm or a motor vehicle, for instance — the assault will amount to an aggravated assault. To illustrate, suppose that you are driving down an Interstate highway, and you intentionally steer your car into an adjacent lane, having carefully checked to see that the lane is unoccupied and that you might safely change lanes. If you missed another

33

vehicle in your blind spot, and if by encroaching upon its lane, you cause the driver of the other vehicle to apprehend an imminent and violent injury, you have committed an assault under <u>Dunagan</u> and its progeny, one that may well be aggravated by your use of the vehicle. Or suppose that you begin to pull out onto a busy roadway, but you stop short after realizing that oncoming traffic was approaching more quickly than you originally had thought. These sorts of things have happened to most of us. In most instances, we react quickly enough (or the other driver does) to avoid any physical harm. But under <u>Dunagan</u> and its progeny, if such acts happen to put another in reasonable apprehension of an imminent and violent injury, we have committed an aggravated assault. Under the precedents of this Court, most farmers and teachers, peace officers and preachers, lawyers, and members of this Court, as well as many members of the General Assembly, would be felons, saved from prosecution only by the grace of a prosecuting attorney.[19]

---

[19] At oral argument, the State agreed that a prosecution upon such hypothetical facts would amount to a misuse of the statute, but the State failed to explain why that is so if the statute means what <u>Dunagan</u> and its progeny hold. The State says that the cases offer no examples of such misuse, although Patterson may well take issue with that statement. In any event, the position of the State boils down to an argument that the courts should trust the good nature, sound judgment, and grace of prosecuting attorneys. I harbor no doubt about the integrity of prosecuting attorneys generally, but that is not how courts ordinarily construe the criminal laws. See <u>Baggett v. Bullitt</u>, 377 U. S. 360, 373 (III) (84 SCt 1316, 12 LE2d 377) (1964) ("It will not do to say that a prosecutor's sense of

34

These illustrations suggest, of course, that <u>Dunagan</u> and its progeny have construed OCGA § 16-5-20 (a) (2) far more expansively than the General Assembly might reasonably be thought to have intended when it enacted the statute in 1968. More important, however, these illustrations show the potential for the statute to substantially displace other provisions of our criminal law. Reckless conduct, for instance, requires conduct that exposes another to a risk of harm, see OCGA § 16-5-60 (b), but as this Court has construed OCGA § 16-5-20 (a) (2), in every case of reckless conduct in which the person exposed to a risk of harm perceives the exposure and apprehends an imminent and violent injury, the reckless conduct amounts to an assault. The same is true with respect

fairness and the Constitution would prevent a successful perjury prosecution for some of the activities seemingly embraced within the sweeping statutory definitions."); <u>United States v. Moon Lake Elec. Assn.</u>, 45 FSupp2d 1070, 1084 (III) (b) (D. Colo. 1999) ("While prosecutors necessarily enjoy much discretion, proper construction of a criminal statute cannot depend upon the good will of those who must enforce it.").

The majority likewise hints that "ordinary behavior" perhaps might not properly form the basis for an aggravated assault, referring to the "element" of "when used offensively against a person." In the first place, this putative limitation would not apply at all to simple assaults, nor would it apply to assaults aggravated by use of a "deadly weapon," as opposed to an "object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." Second, it is not clear that the so-called element to which the majority refers is anything more than an essential characteristic of an "object, device, or instrument" that may form the basis for an aggravated assault under former OCGA § 16-5-21 (a) (2). Most important, if the purpose for which one uses an "object, device, or instrument" is inconsequential — and the majority makes clear that such an intent is entirely irrelevant — it is difficult to understand how a requirement that the "object, device, or instrument" be used "offensively" marks any meaningful limitation. In any event, the decision to stand by <u>Dunagan</u> and its progeny portends great uncertainty and perhaps more jurisprudential incoherence to come.

35

to reckless driving, see OCGA § 40-6-390 (a), and it is equally true of the reckless misuse of a firearm while hunting. See OCGA § 16-11-108 (a). As for the intentional pointing of a firearm at another, see OCGA § 16-11-102, if the other person perceives the pointing and apprehends injury, the pointing is an aggravated assault, irrespective of the intent, knowledge, or negligence of the accused. Especially because the 1968 revision was intended in part to eliminate or minimize the overlapping of statutes, the substantial potential for the displacement of other criminal laws calls into substantial doubt the workability of Dunagan and its progeny.

As for the analytical soundness of the precedents, I have said enough already. The majority today attempts to prop up these precedents by reference to statutory text, but its analysis is largely indifferent to relevant and important statutory context and is not, therefore, complete or convincing. Dunagan and its progeny are based on a misapprehension of Rhodes, they are inconsistent with the most natural and reasonable understanding of OCGA § 16-5-20 (a) (2), they are out of step with the understanding of criminal assault in American law generally, and they mark Georgia as an outlier. They are not firmly established in our jurisprudence, they implicate no meaningful reliance interests, they

36

threaten the substantial displacement of other provisions of statutory law, and they recognize a species of assault that approaches strict liability and is ripe for misuse and abuse. If the statutory text were most properly understood in the way that Dunagan, its progeny, and the majority today suggest, that would be one thing. But the text is more naturally and reasonably understood otherwise.

That the General Assembly might readily amend OCGA § 16-5-20 (a) (2) to prospectively overturn Dunagan and its progeny is the only factor that supports continuing adherence to those precedents. For the most part, this is the factor on which the majority hangs its decision, going so far as to suggest that the General Assembly effectively has ratified Dunagan by its failure to amend the statute and require a specific intent explicitly. It is one thing to infer legislative acquiescence when the General Assembly has substantially changed a statutory provision but retained language that we previously construed. The inference is much weaker, however, where the General Assembly has done *nothing* substantive with the provision in question since we construed it, especially when our precedents lack the sort of meaningful analysis that would draw attention to the issue and mark it as a debatable one. See Jackson, 287 Ga.

at 659 (5), n.8. Since <u>Dunagan</u>, the General Assembly has made no substantive change to OCGA § 16-5-20 (a) (2).

Even when there is a strong reason to infer legislative acquiescence, this Court has found compelling reasons to depart from precedents about the meaning of a statute. See, e.g., <u>Garza v. State</u>, 284 Ga. 696, 702-703 (1) (670 SE2d 73) (2008). We have a duty to ascertain the meaning of the statutory law, and we must endeavor to do so in a way that is consistent with the familiar and settled principles of statutory interpretation. Sometimes we may get it wrong, and yet, if we have made our best effort, it may be more appropriately left to the General Assembly to set things right. But before we call it a day and declare our judicial work at an end, we ought to try at least once to undertake the sort of careful textual analysis (including a consideration of relevant context) that, if done properly, would reveal the most natural and reasonable understanding of the statue. Construing OCGA § 16-5-20 (a) (2) by misreading past opinions (like <u>Rhodes</u>) to decide issues that they do not decide and looking to statutory text without careful attention to context, does not, in my opinion, discharge our duty. "We ought not follow unreasoned precedent without reason." <u>Crayton v. State</u>, 298 Ga. 792, 803 (784 SE2d 343) (2016) (Blackwell, J., dissenting).

38

For these reasons, I would overrule <u>Dunagan</u> and its progeny to the extent that they construe OCGA § 16-5-20 (a) (2) to require only an intent to do the act that places another in reasonable apprehension of an imminent and violent injury. Consistent with the most natural and reasonable understanding of the statute, I would hold that it instead requires a specific intent either to inflict injury or to arouse an apprehension of injury. Because a majority of the Court has seen fit to stand by our erroneous precedents, however, if the original and ordinary meaning of the statute is to prevail, it now will require further action by our General Assembly. I respectfully dissent.

I am authorized to state that Justice Melton and Justice Nahmias join in this dissent.